## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| 1347 PROPERTY INSURANCE HOLDINGS, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 2:16-cv-1726 |
| FOLEY & LARDNER LLP, | ) ) | JURY TRIAL DEMANDED |
| Defendant. | ) ) | |

## COMPLAINT

Plaintiff, 1347 Property Insurance Holdings, Inc. ("1347"), by and through its undersigned counsel, for its Complaint against Defendant, Foley & Lardner LLP ("Foley"), states as follows:

## PARTIES

1.      1347 is a Florida limited liability company with its principal place of business at 1511 North Westshore Boulevard, Suite 870, Tampa, Florida 33607.

2.      Foley is a Wisconsin limited liability partnership with its principal place of business at 777 East Wisconsin Avenue, Milwaukee, Wisconsin 53202.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the matter in controversy is between citizens of different states.

4.      Venue is proper in the Eastern District of Wisconsin under 28 U.S.C. § 1391(b)(1) because Foley resides in this judicial district.

## FACTS

5.      1347 retained Foley to serve as its legal counsel with respect to its acquisition of ClaimCor, LLC ("ClaimCor") from SDii Global Corporation ("SDii") in a transaction that closed on January 2, 2015 (the "Transaction").

6.      1347 paid Foley for its services with respect to the Transaction.

7.      In early December 2014, Foley drafted a Membership Interest Purchase Agreement that governed the Transaction.

8.      Foley also drafted supporting documents that were necessary to the consummation of the Transaction.

9.      Among those supporting documents was a restrictive covenant, titled the "Noncompete Agreement," that the owners of SDii, David Howard and Robert Windschauer, signed on January 2, 2015, the same date on which the Transaction closed.

10.      Neither of ClaimCor's two key employees, Jeremy Menard ("Menard") and Warren Ritter ("Ritter"), signed a restrictive covenant as part of the Transaction.

11.      Menard became an employee of ClaimCor on or about January 21, 2013 and was ClaimCor's President at the time of the Transaction.

12.      Ritter became an employee of ClaimCor on or about July 1, 2013 and was ClaimCor's Claims Manager at the time of the Transaction.

13.      Foley did not prepare restrictive covenants for Menard and Ritter to sign as part of the Transaction.

14.      An attorney using the degree of care a reasonably careful attorney would use under like circumstances would have prepared restrictive covenants for Menard and Ritter to sign as part of the Transaction.

2

15.     Foley did not consult with 1347 regarding the possibility of Menard's and Ritter's signing restrictive covenants as part of the Transaction.

16.     An attorney using the degree of care a reasonably careful attorney would use under like circumstances would have consulted with 1347 regarding the possibility of Menard's and Ritter's signing restrictive covenants as part of the Transaction.

17.     Foley did not communicate or explain to 1347 the legal import of obtaining restrictive covenants from Menard and Ritter as part of the Transaction.

18.     An attorney using the degree of care a reasonably careful attorney would use under like circumstances would have communicated or explained to 1347 the legal import of obtaining restrictive covenants from Menard and Ritter as part of the Transaction.

19.     Foley did not advise 1347 to obtain restrictive covenants from Menard and Ritter as part of the Transaction.

20.     An attorney using the degree of care a reasonably careful attorney would use under like circumstances would have advised 1347 to obtain restrictive covenants from Menard and Ritter as part of the Transaction.

21.     Indeed, at a social gathering in or around April 2015, the partner at Foley who served as 1347's lead attorney with respect to the Transaction admitted to 1347's CEO that Foley's failure to advise 1347 to obtain restrictive covenants from Menard and Ritter as part of the Transaction was "a problem."

22.     If Foley had (1) prepared restrictive covenants for Menard and Ritter to sign, (2) consulted with 1347 regarding the possibility of Menard's and Ritter's signing restrictive covenants, (3) communicated or explained to 1347 the legal import of obtaining restrictive covenants from Menard and Ritter, or (4) advised 1347 to obtain restrictive covenants from

3

Menard and Ritter, then 1347 would have insisted that Menard and Ritter sign restrictive covenants as a prerequisite to consummating the Transaction.

23. Menard and Ritter would have signed restrictive covenants as part of the Transaction had 1347 insisted that they do so.

24. On February 5, 2015, when they were still ClaimCor employees, Menard and Ritter formed Menard Adjusting, LLC ("Menard Adjusting") as the only two members of Menard Adjusting, designating themselves as Authorized Members and using the ClaimCor telephone number issued to Menard for his ClaimCor employment as the contact number for Menard Adjusting.

25. 1347 terminated both Menard's and Ritter's employment with ClaimCor on March 4, 2015, immediately after it discovered that Menard and Ritter had formed Menard Adjusting.

26. Since February 2015, Menard Adjusting has been in direct competition with ClaimCor.

27. In February 2015, when Menard and Ritter were still ClaimCor employees, they exploited their status as ClaimCor employees to solicit ClaimCor's three most significant clients—American Integrity Insurance Company of Florida, Inc. ("American Integrity"), Modern USA Insurance Company ("MUSA"), and American Traditions Insurance Company ("ATIC") (collectively, the "Clients")—and induced them to terminate their business relationships with ClaimCor in favor of Menard Adjusting.

28. Before February 2015, the Clients, which are Florida insurance carriers, all had longstanding business relationships with ClaimCor whereby ClaimCor adjusted insurance claims on their behalf, and ClaimCor derived over 70 percent of its revenue from providing that service to the Clients.

4

29.     The Clients all represented to ClaimCor in December 2014 that they intended to maintain their business relationships with ClaimCor.

30.     ClaimCor requested those representations from the Clients in anticipation of the Transaction.

31.     On or before December 11, 2014, ClaimCor informed the Clients that 1347 was contemplating the Transaction and that 1347 owned Maison Insurance Company ("Maison"), an insurance company that wrote policies exclusively in Louisiana at the time.

32.     Menard sent an email to 1347 on December 11, 2014, stating that American Integrity had represented to him that it intended to maintain its business relationship with ClaimCor after the Transaction because "1347 is not a competitor."

33.     Menard sent a second email to 1347 on December 11, 2014, stating that ATIC and MUSA had represented to him that they intended to maintain their business relationships with ClaimCor after the Transaction because "they have no conflict with the sale."

34.     Notwithstanding these December 2014 communications, the Clients all terminated their business relationships with ClaimCor in February 2015, as Menard and Ritter diverted the Clients' business from ClaimCor to Menard Adjusting while they were still employed by ClaimCor

35.     On February 3, 2015 at 2:36 p.m., Menard sent an email to Collin de Gourville of American Integrity with the subject line "just a reminder."  In that email, Menard stated, "Please send me an email stating why [American Integrity] chose to remove ClaimCor from their [Independent Adjuster] roster."

36.     On February 3, 2015 at 2:59 p.m., Collin de Gourville of American Integrity sent an email to Menard with the subject line "American Integrity's Decision to Discontinue Assignments," wherein de Gourville stated that American Integrity was terminating its relationship

5

with ClaimCor because 1347 owns Maison, and "American Integrity chooses not to do business with vendors which may benefit direct or future competitors."

37.    On February 3, 2015 at 4:13 p.m., Menard responded to de Gourville's email outlined in the paragraph 32 by saying, "Thank you Collin."

38.    Menard solicited de Gourville's email regarding American Integrity's decision to discontinue doing business with ClaimCor.

39.    American Integrity chose to stop doing business with ClaimCor due to the actions of Menard.

40.    Altogether, the actions of Menard and Ritter led to the Clients terminating over 70 percent of ClaimCor's business.

41.    1347 has sustained and will continue to sustain damages—including, but not limited to, diminution of value in excess of $300,000, lost profits in excess of $1,200,000, and costs and attorneys' fees in excess of $100,000 that it has incurred in prosecuting a lawsuit in Florida state court against Menard, Ritter, and Menard Adjusting—as a consequence of the Clients' terminating their business relationships with ClaimCor.

42.    But for Foley's failure to use the degree of care a reasonably careful attorney would use under the circumstances, Menard and Ritter would have signed restrictive covenants as part of the transaction.

43.    Had Menard and Ritter signed restrictive covenants as part of the Transaction, they would have continued working for ClaimCor, they would not have formed Menard Adjusting and solicited the Clients, the Clients would not have terminated their business relationships with ClaimCor, and 1347 would not have sustained damages in excess of $1,600,000.

6

## COUNT I
## LEGAL MALPRACTICE

44. Plaintiff hereby incorporates and re-alleges paragraphs 1 through 43 as if fully set forth herein.

45. 1347 employed Foley to serve as its legal counsel with respect to the transaction.

46. Foley neglected its duty to use reasonable care as 1347's legal counsel in the following ways:

      a. by failing to prepare restrictive covenants for Menard and Ritter to sign as part of the Transaction;

      b. by failing to consult with 1347 regarding the possibility of Menard's and Ritter's signing restrictive covenants as part of the Transaction;

      c. by failing to communicate or explain to 1347 the legal import of obtaining restrictive covenants from Menard and Ritter as part of the Transaction; and

      d. by failing to advise 1347 to obtain restrictive covenants from Menard and Ritter as part of the Transaction.

47. Foley's negligence directly and in natural and continuous sequence caused 1347 to sustain damages in excess of $1,600,000, such that 1347 would not have sustained those damages but for Foley's negligence.

7

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, 1347 Property Insurance Holdings, Inc., respectfully requests this Court to enter judgment in its favor and against Defendant, Foley & Lardner LLP, and to grant it the following relief:

A.    On Count I, an award of compensatory damages in excess of $1,600,000 and equal to its financial loss proven to have resulted from Defendant's legal malpractice;

B.    An award of Plaintiff's attorneys' fees and costs incurred in this action;

C.    Pre-judgment and post-judgment interest; and

D.    Such other and further relief as this Court may deem just and proper.

Dated: December 30, 2016                    Respectfully submitted,

RUBERRY, STALMACK & GARVEY, LLC

/s/ Alexander R. Hess
Alexander R. Hess
RUBERRY, STALMACK & GARVEY, LLC
10 South LaSalle Street, Suite 1800
Chicago, Illinois 60603
(312) 466-8050 (telephone)
(312) 466-8055 (fax)
alex.hess@rsg-law.com

*Counsel for Plaintiff, 1347 Property Insurance Holdings, Inc.*

8